UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIMBERLY ROSS,<br><br>      *Plaintiff*,<br><br>v.<br><br>MARCO RUBIO,<br><br>      *Defendant*. | Civil Action No. 1:24-cv-02969 (CJN) |

**MEMORANDUM OPINION**

Plaintiff Kimberly Ross claims that her employer, the State Department, discriminated against her based on race, sex, and age, and also retaliated against her for protected conduct. The Government moves to dismiss; for the reasons below, the Court grants the Government's motion.

**I.    Background**

Ross, an African American woman born in 1970, was hired as the Director of the Office of Global Publishing Solutions at the State Department in September 2019. ECF No. 1 (Compl.) ¶¶ 10–11.[1] That office provides design, print, and copier management services to the State Department domestically and overseas.[2] Ross's direct supervisor at all times relevant to this action was Eric Stein, a white male born in 1983. *Id.* ¶ 16.

---

[1] The Court takes this and the following factual assertions from Ross's complaint and, of course, accepts them as true for purposes of evaluating the motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

[2] *See* U.S. Dep't of State, *Office of Global Publishing Solutions*, https://www.state.gov/bureaus-offices/under-secretary-for-management/bureau-of-administration/office-of-global-publishing-solutions (last visited Feb. 5, 2026).

On January 13, 2023, Ross met with Parker Gallagher, a white male born in 1961 who served as Division Chief in the Bureau of Diplomatic Security. *Id.* ¶¶ 20–21. During the meeting—which also included two of Ross's female, African American subordinates—Gallagher displayed an organizational chart and asked Ross and her colleagues, "Who's who in the zoo?" *Id.* ¶¶ 21, 23. Ross attempted to return to her agenda, but Gallagher interrupted her, saying, "I need to let you know the importance of these publications." *Id.* ¶ 25. Gallagher then stood over her aggressively, causing the subordinates to leave the room in discomfort. *Id.* ¶¶ 26–27. Ross and one of those subordinates later reported the incident to Stein, who suggested that they could call security but took no further action. *Id.* ¶¶ 28–29. In addition, between December 28, 2022, and January 27, 2023, Gallagher sent Ross and her staff persistent, demanding emails regarding tasks for which he was already receiving daily updates, or which had already been completed. *Id.* ¶ 31.

Ross contacted the Agency's Equal Employment Opportunity ("EEO") office about these events on January 23, 2023. *Id.* ¶ 32. She also took leave under the Family and Medical Leave Act from around February 13, 2023, to May 15, 2023, to cope with the stress caused by Gallagher's behavior, which included chest pains brought on by anxiety. *Id.* ¶ 33–34. While she was on leave, Ross's subordinates contacted her to complain about Stein's management. *Id.* ¶ 35. Those subordinates reported that Stein used a comic with a noose in it during a staff meeting and ignored a staffer's complaint that a customer had berated State Department staff. *Id.* ¶¶ 35–36.

A State Department EEO officer spoke to Stein about Ross's complaint on or about February 14, 2023. *Id.* ¶ 37. In the weeks and months afterward, Ross was subjected to various other actions by Stein that she perceived as hostile, namely:

- From July 2023 to January 23, 2024, Stein refused to submit Ross's legislative proposal regarding her office's authorization to accept personal payment from State Department employees, which she believed would have generated additional revenue for Global Publishing Solutions;

- In August 2023, Stein advised Ross that Global Publishing Solutions would not receive Congressionally appropriated funds in 2023, causing the office's accounts to end in a negative status for the fiscal year and thus affecting Ross's performance rating;

- In October 2023, Stein ignored Ross's cost assessment regarding the replacement of civil servants with federal government contractors and simultaneously prevented Ross from raising prices, resulting in a negative effect on the office's financial status and her performance rating;

- On January 17, 2024, Ross learned that Stein did not give her a performance award for fiscal year 2022, even though Ross had received an "Outstanding" performance rating, the highest possible rating; and

- On January 25, 2024, Stein advised Ross that he would downgrade Ross's annual performance rating for fiscal year 2023 due to the negative financial results of her office's working capital fund.

*Id.* ¶¶ 38–45; *see also id.* ¶¶ 52, 60, 67, 75, 83 (restating those allegations for each claim).

Ross brought this suit on October 18, 2024, alleging discrimination based on race, sex, and age, as well as retaliation for protected conduct. *See generally id.* The Government moves to dismiss under Federal Rule of Civil Procedure 12(b)(6). ECF No. 12 (Mot.).

3

## II. Legal Standard

A complaint warrants dismissal if it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although courts must accept as true all factual allegations in a complaint, the same deference is not owed to legal conclusions. *Id.* Plaintiffs therefore cannot rely on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* Nor are courts "bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## III. Analysis

Ross asserts five claims in her complaint: Title VII race and sex discrimination (Counts I and II), ADEA age discrimination (Count III), "intersectional" discrimination in violation of both Title VII and the ADEA (Count IV), and retaliation in violation of both Title VII and the ADEA (Count V). *See* Compl. ¶¶ 48–88. Her claims fail because, even assuming that she has suffered an adverse employment action, her complaint lacks sufficient factual allegations from which to infer that she experienced discrimination or retaliation *because of* her immutable traits or protected activity.

### A. Race, Sex, and Age Discrimination

Title VII makes it "an unlawful employment practice . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race,

4

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *Chambers v. D.C.*, 35 F.4th 870, 873–75 (D.C. Cir. 2022) (en banc). The ADEA requires that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . in executive agencies . . . be made free from any discrimination based on age." 29 U.S.C. § 633a(a); *Barnette v. Chertoff*, 453 F.3d 513, 515 (D.C. Cir. 2006).

### 1. Legal Framework

Under both statutes, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, national origin, age, or disability." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *see also Wilson v. Cox*, 753 F.3d 244, 247 (D.C. Cir. 2014) (courts "generally apply the same approach in ADEA cases" as "in Title VII cases"). "An adverse employment action is a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (internal quotation marks omitted). "To make out a Title VII discrimination claim," a plaintiff "must show some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 354–55 (2024).

As to causation, a plaintiff need not "plead the elements of a prima facie case" to survive a motion to dismiss. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). But "[s]he must nevertheless plead sufficient facts to show a plausible entitlement to relief." *Fennell v. AARP*, 770 F. Supp. 2d 118, 127 (D.D.C. 2011) (emphasis deleted). Thus, despite the general "ease with which a plaintiff claiming employment discrimination can survive a . . . motion to dismiss," *id.* (quotation marks omitted; ellipses in original), a court must still determine "whether

the inferences of discrimination drawn by the plaintiff are reasonable and plausibly supported." *Townsend v. United States*, 236 F. Supp. 3d 280, 298 (D.D.C. 2017).

**2.     Application**

Ross must first plead that "she suffered an adverse employment action." *Baloch*, 550 F.3d at 1196.  Here, Ross asserts several adverse actions, ranging from Stein's failure to address Gallagher's "Who's who in the zoo" remark to the promised lower performance review for fiscal year 2023.  *See* Compl. ¶ 52 and *supra* at 2–3.  The Government argues that none of those actions qualifies as sufficiently adverse, *see* Mot. at 8–12, although it concedes that the refusal to issue her a 2022 performance award is "possibl[y] adverse."  *Id.* at 6; *see also* ECF No. 17 (Reply) at 2 ("Plaintiff Has Alleged Only One Adverse Action").  The Court assumes without deciding that the withheld performance award satisfies the adverse action requirement because Ross has not sufficiently alleged that her employer took any of these actions *because of* her protected traits.[3]

---

[3] Most of Ross's alleged adverse actions plainly do not rise to the level required by caselaw. "[E]mployers are permitted to criticize an employee's work without giving rise to a federal cause of action," and "[f]ormal criticism and poor performance evaluations do not ordinarily constitute adverse actions." *Bryant v. Brownlee*, 265 F. Supp. 2d 52, 62 (D.D.C. 2003) (citations and internal quotation marks omitted).  Further, while Ross may blame Stein for failing to adopt her proposal to modify how her office accepts payments, "[m]erely disagreeing with, or even being upset by, a supervisor's decision does not alter an employee's conditions of employment." *Moore-Davis v. U.S. Dep't of the Navy*, 694 F. Supp. 3d 116, 124 (D.D.C. 2023) (citation and internal quotation marks omitted).  In other words, many of Ross's alleged adverse actions look more like management decisions that "fall into the category of a supervisor's ordinary workplace exercise of authority," not decisions that "adversely affect the conditions of [Ross's] employment"—even if Stein's decisions "undoubtedly caused tribulations" and "eroded [Ross's] morale." *Heavans v. Dodaro*, 648 F. Supp. 3d 1, 14 (D.D.C. 2022); *see also Bonnette v. Shinseki*, 907 F. Supp. 2d 54, 70 (D.D.C. 2012) (noting that "disagreements about management policies" generally "do not qualify as adverse").  But the Court will assume without deciding that Stein's refusal to give Ross a performance award satisfies the adverse action requirement because, taking all inferences in Ross's favor, it is possible that "the failure to receive a performance award . . . resulted in an economic harm." *Saunders v. Mills*, 172 F. Supp. 3d 74, 92 (D.D.C. 2016).

Ross's complaint does not establish that her "inferences of discrimination . . . are reasonable and plausibly supported." *Townsend*, 236 F. Supp. 3d at 298. Her age and sex discrimination claims offer little more than legal conclusions couched as factual allegations: *i.e.*, Stein and Gallagher are younger men, and she is an older woman, so therefore their conduct must be motivated by a desire to discriminate based on age and sex. *See Papasan*, 478 U.S. at 286. Ross's memorandum in opposition to the Government's motion does not even offer a defense of those claims: She cites four cases in support of her race discrimination claim, and two more cases asserting that her "allegations reflect intersectional discrimination," ECF No. 14 (Response) at 14, but nowhere does she even contend that her supervisor's actions were caused in any way by her age or sex. *See id.* at 13–15.

Ross's race discrimination claim is a closer call, as here she at least alleges events that could plausibly give rise to an inference of race discrimination: namely, Gallagher's "who's who in the zoo" comment and the use of a comic with a noose in it. *See* Compl. ¶¶ 23, 35, 52. But the cases she cites in support of her claim cannot bear the weight she places on them. In *Yazzie v. National Org. for Women*, *see* Response at 13, the defendant called the plaintiff, "You P.O.C.," an acronym for "person of color," and then arguably tied the use of that racial term to the plaintiff's employment by yelling, "You won't be here for three years." 712 F. Supp. 3d 56, 79–80 (D.D.C. 2024). But the Court did not even consider that "*direct* evidence" that the employer terminated the plaintiff "because of her race," only allowing the plaintiff's claim to proceed because of other evidence such as the defendant's plausibly "trumped up or exaggerated" explanations for its adverse action. *Id.* at 80, 82. Here, Stein's alleged conduct does not come close to the defendant's

7

conduct in *Yazzie*, and Ross does not allege that Stein offered any pretextual explanations for his actions.[4]

Ross also invokes *Ash v. Tyson Foods, Inc.* for the truism that "racial code language is context-dependent and may support [an] inference of bias." Response at 14 (citing 546 U.S. 454 (2006) (per curiam)). *Ash*, a summary reversal of a decision that had the effect of nullifying a jury verdict in favor of two plaintiffs, involved a defendant who had on multiple occasions referred to the African American plaintiffs as "boy," language the Eleventh Circuit had held was insufficient on its own to demonstrate racial bias. 546 U.S. at 456. In reversing, the Supreme Court held only that "[i]nsofar as the Court of Appeals held that modifiers or qualifications are necessary in all instances to render the disputed term probative of bias, the court's decision is erroneous." *Id.* But the Government does not contend here that comments employing the word "zoo" can *never* be probative of discriminatory intent, just that "the reasonable interpretation" of the zoo remark, "made after looking at an organizational chart, is that Mr. Gallagher was asking where the individuals at the meeting fell on the organizational chart." Mot. at 6.

The Court agrees with the Government that Gallagher's comment does not give rise to an inference that her race motivated the allegedly adverse employment actions. Ross must "establish a nexus between [her employer's] alleged discriminatory motive and the adverse action," which requires her to "present evidence above the speculative level." *Easaw v. Newport*, 253 F. Supp.

---

[4] For similar reasons, *Ayissi-Etoh v. Fannie Mae*, in which the defendant allegedly said to the plaintiff, "Get out of my office [n-word]," is inapposite. 712 F.3d 572, 574 (D.C. Cir. 2013) (per curiam); *see* Response at 13–14. Ross also invokes *Jones v. Air Line Pilots Ass'n, Int'l* for the proposition that "direct evidence, patterns of disparate treatment, or racially charged statements can also infer discrimination." Response at 14 (citing 713 F. Supp. 2d 29, 37 (D.D.C. 2010)). The portion of the decision to which Ross's brief points does not establish that proposition, and the Court cannot glean that proposition from anywhere else in that decision, either. Indeed, *Jones*, which concerns pilots challenging a mandatory retirement age established by federal statute, does not mention race discrimination at all.

3d 22, 30 (D.D.C. 2017) (internal quotation marks omitted). But even accepting her allegations as true and drawing all reasonable inferences in her favor, "no facts alleged in [her] complaint support anything 'more than a sheer possibility that [the] defendant has acted unlawfully.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). To start, Gallagher was not Ross's supervisor, so his conduct—uncomfortable as it may have made Ross and her team—does not alone support her race discrimination claim. Instead, Ross's claim turns on establishing that *Stein*'s conduct was motivated by race, which Ross attempts to do by arguing that Stein's indifference about Gallagher's conduct (and Stein's alleged inclusion of a noose in a comic) itself evinces racial animus. But nothing in Ross's complaint offers any reason to believe that Stein's decision was linked to those prior incidents.[5]

"In sum, considering the complaint in its entirety, accepting all factual allegations in the complaint as true and construing all reasonable inferences" in Ross's favor, her complaint "simply does not contain sufficient factual allegations to 'nudge' [her discrimination claims] 'across the line from conceivable to plausible.'" *Easaw*, 253 F. Supp. 3d at 32 (quoting *Twombly*, 550 U.S. at 570). "Lacking facts that could give rise to an inference of a discrimination," *id.*, Ross's discrimination claims do not go beyond "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Accordingly, the Government's motion to dismiss Counts I–IV of Ross's complaint is granted.[6]

---

[5] Ross devotes surprisingly little attention in her brief to the noose comic, considering that it is one of her only allegations that plausibly relates directly to race. She does not describe the contents of the comic strip or the context in which it appears, offering no further reason to believe that the comic was racially insensitive. She also does not even mention the incident as part of her race discrimination count, in contrast to the zoo remark. *See* Compl. ¶¶ 48–55.

[6] Ross also includes a count of "Intersectional 'Sex Plus' Discrimination Based on Gender, Race, and Age." Compl. Count IV. That claim is distinct from her other discrimination claims, Ross argues, because Title VII "prohibits individuals from being subjected to discrimination because of the intersection of their race and a trait covered by another EEO statute," such as "race and age."

## B. Hostile Work Environment

Ross does not allege a hostile work environment as a separate count in her complaint. But her race, sex, and intersectional discrimination counts allege that the State Department "created a hostile work environment" by "discriminating against Ross." Compl. ¶¶ 52, 60, 75. And her opposition argues that she has alleged a legally actionable hostile work environment claim. Response at 17–19. Separately pleaded or not, this claim fails.

A hostile work environment claim requires an employee to have been subjected to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201. Hostile or harassing behavior "must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

A "plaintiff asserting a claim based on a hostile work environment faces a high hurdle," and Ross has not met it. *Fields v. Vilsack*, 207 F. Supp. 3d 80, 92 (D.D.C. 2016). "[T]o sustain a hostile work environment claim," Ross must be able to "produce evidence that she was discriminated against because of her [disabled status]." *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 107 (D.D.C. 2005) (quotation marks omitted), *aff'd sub nom. Nurriddin v. Griffin*, 222 F. App'x 5

---

Response at 14. But the alloy of Ross's intersectionality claim is no stronger than the sum of its parts. Put differently, Ross fails plausibly to allege that her employer took actions against her *because of* these combined traits. Count IV is thus dismissed for the same reasons as Counts I, II, and III.

(D.C. Cir. 2007). But her complaint alleges little more than the sporadic offensive conduct or disagreements with management decisions that the "demanding" hostile work environment standard is designed to "filter out." *Faragher*, 524 U.S. at 788; *see also Baloch*, 550 F.3d at 1201. The "zoo" comment, viewed in the totality of the circumstances, falls short of the "high hurdle" set by this Court's precedent.[7] And the noose cartoon allegation is even vaguer; Ross does not say what the cartoon depicted, nor that it was directed at her, nor that she even witnessed it. Accordingly, because Ross's allegations do not constitute a "pattern of discriminatory intimidation, ridicule, and insult," *Baloch*, 550 F.3d at 1201 (quoting *Harris*, 510 U.S. at 21), her hostile work environment claim must be dismissed.

### C.   Title VII and ADEA Retaliation

Finally, to plead retaliation, a plaintiff "must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim." *Baloch*, 550 F.3d at 1198.[8] An action is "materially adverse" in the retaliation context if it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation

---

[7] *See, e.g.*, *Barrett v. Pepco Holdings*, 275 F. Supp. 3d 115, 122–23 (D.D.C. 2017) (allegations that the plaintiff had been segregated from her peers, subjected to greater scrutiny when taking breaks, called a "derogatory word," and been the target of "unspecified threats," among other allegations, were insufficient to state a hostile work environment claim); *Golden v. Mgmt. & Training Corp.*, 266 F. Supp. 3d 277, 286 & n.7 (D.D.C. 2017) (neither an alleged failure to address the plaintiff's administrative concerns nor the plaintiff's alleged placement on a performance improvement plan, either "viewed separately or in the aggregate[,] could reasonably be considered to have created a 'hostile work environment'"); *Allen v. Napolitano*, 774 F. Supp. 2d 186, 205 (D.D.C. 2011) (plaintiff's "claims that she was excluded from meetings, received unreasonable deadlines, denied training opportunities, and assigned busy work assignments" failed to state a hostile work environment claim).

[8] "[T]he test for determining retaliation under the ADEA and Title VII is identical." *Tomasello v. Rubin*, 167 F.3d 612, 619 (D.C. Cir. 1999).

marks omitted). As to the second element, a plaintiff must demonstrate that "a causal link connects" the adverse action to the protected activity. *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). Temporal proximity between the adverse action and the protected activity can support "an inference of causation, but only where the two events are 'very close' in time." *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (internal citations omitted).

Stein learned about Ross's complaint in February 14, 2023. Compl. ¶ 37. The first alleged retaliatory act—the refusal to submit her legislative proposal—did not occur until July 2023, five months later. *See id.* ¶ 83. The Court of Appeals "has often analyzed temporal proximity in terms of months—not years." *Pueschel v. Chao*, 955 F.3d 163, 167 (D.C. Cir. 2020); *see, e.g.*, *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 69 (D.C. Cir. 2015) (five months is too long to infer causation); *Hamilton v. Geithner*, 666 F.3d 1344, 1358 (three months too long); *Mitchell v. Baldrige*, 759 F.2d 80, 86–87 (D.C. Cir. 1985) (four months too long). Even a period as short as "two days short of three months" has been described as "clearly push[ing] the temporal requirement in a retaliation case to its outer limit." *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 118–19 (D.D.C. 2004), *aff'd*, No. 04-5181, 2004 WL 2348142 (D.C. Cir. Oct. 19, 2004). So even if Stein's disagreement with Ross's legislative proposal constitutes an adverse action, temporal proximity offers no basis on which to infer that Stein's decision was retaliatory.

Nor does Ross offer any other evidence of retaliatory intent. She asserts that "even indirect evidence of retaliatory animus—including temporal proximity, managerial hostility, and escalated scrutiny—can sufficiently allege causation at the pleading stage." Response at 15. Ross invokes *Nurriddin v. Bolden* in support of her argument that her "allegations of interference with legislative proposals, denial of funding, and attacks on her performance evaluations align with the kind of managerial hostility courts have found actionable." *Id.* (citing 674 F. Supp. 2d 64, 91–92 (D.D.C.

2009)).  But in *Nurriddin*, the Court held that the plaintiff had "come forward with much more than a temporal relationship," including allegations that during the plaintiff's performance evaluation, one of his supervisors had "called plaintiff's EEO complaints 'a crock of shit' and 'just bullshit,' and then told him to '[g]o file another EEO complaint.'" *Nurriddin*, 674 F. Supp. 2d at 92.  Obviously, an employer's insulting remarks to an employee about the employee's own EEO report can give rise to an inference that the employer bore the employee some animus for filing that report.  Ross alleges nothing close to that here.

Ross argues that "[w]hen other circumstantial evidence exists, temporal gaps do not defeat retaliation claims at the pleading stage." Response at 16–17 (citing *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015)).  But Ross's brief simply assumes the existence of that "other circumstantial evidence."  Nothing in her complaint fairly leads to an inference that any protected activity was the but-for cause of the allegedly adverse actions.  Rather, as with her discrimination claims, Ross offers little more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

## IV.   Conclusion

For the foregoing reasons, the Government's motion to dismiss, ECF No. 12, is granted.  A separate Order will issue contemporaneously.

DATE:  February 5, 2026

*[signature]*

CARL J. NICHOLS
United States District Judge